THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,           :
                                    :
        v.                          :    3:20-CR-262
                                    :    (JUDGE MARIANI)
TYLEE BROWN,                        :
                                    :
            Defendant.              :

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Tylee Brown was arrested on April 30, 2020, and charged with numerous

offenses related to methamphetamine trafficking on October 13, 2020.  (Doc. 1.)  Presently

before the Court is Defendant's Motion to Suppress Evidence obtained by law enforcement

on the day of his arrest in connection with those charges.  (Doc. 113.)  Defendant's Motion

seeks to suppress both physical evidence obtained from a search of the vehicle in which

Defendant was, at one point, a passenger, and statements Defendant made on that date.

(*See id.*)

Defendant filed his Motion to Suppress on December 19, 2022.  (*Id.*)  Defendant

alleges that his seizure, the seizure of the vehicle in which he was a passenger, and the

search of that vehicle were all illegal under the Fourth Amendment, and all evidence

subsequently seized must be suppressed as fruits of the illegal conduct.  (*Id.* at 1–2.)  The

Government filed its brief in opposition on February 10, 2023 (Doc. 121), and a

supplemental brief in opposition on March 16, 2023 (Doc. 125). Defendant filed his reply on April 6, 2023. (Doc. 127.)

This Court held an evidentiary hearing (the "Hearing") on April 6, 2023. Thereafter, the parties each filed post-hearing briefs on May 25, 2023. (Docs. 139, 140.) The motion is now ripe for disposition.

For the reasons that follow, the Court concludes that Defendant's motion is properly granted in part and denied in part.

## II. FACTUAL BACKGROUND[1]

The event giving rise to this action began on the afternoon of April 30, 2020, when Pennsylvania State Police ("PSP") Corporal Carl Ives and Trooper Kyle Hnat were investigating the theft of vehicles, snow mobiles, trailers, and other items in Susquehanna County. (N.T. at 4.)[2] Specifically, Ives testified at the Hearing that he and Hnat had received information that stolen vehicles were located on the property of Clifford Johnson, at 846 Lake Roy Road, Franklin Township, Susquehanna County. (*Id.* at 4–5.)

The Johnson property is a large, secluded lot in an "extremely rural" area. (*Id.* at 5.) The property has no traditional residence, but it has a large, detached garage and three campers. (*Id.* at 9.) The property is accessible only via a long, L-shaped, dirt and gravel

---

[1] The Court bases the factual background on the "Mobile Video Recorder" (commonly referred to as "MVR" or "dash-cam") footage of the events of April 30, 2020 (Gov't Ex. 2), surveillance video footage from the Johnson property (Gov't Ex. 21), the parties' briefs, and hearing testimony.

[2] The Court refers to the Hearing transcript as "N.T."

driveway.  (*Id.*)  Trees surround the property, but on this cold and rainy day in April, the trees were barren and the driveway was muddy.  (*Id.* at 5–6.)

Ives testified that from Lake Roy Road, he and Hnat could see a trailer on the Johnson property.  (*Id.* at 7.)  The trailer had a tarp over it, and "fluorescent green skis sticking out underneath the tarp."  (*Id.* at 5.)  According to Ives, one of the investigations he and Hnat were "actively working" at that time involved a stolen trailer carrying two Arctic Cat snowmobiles with fluorescent green skis.  (*Id.* at 7–8.)

Because Ives and Hnat were in plain clothes and driving an undercover vehicle, they contacted the PSP Gibson Barracks and requested a uniformed officer to accompany them to "make[] contact" at the Johnson property.[3]  (*Id.* at 8.)  Soon after, Sergeant Thomas Horan and Trooper Robert McGrath arrived, both in uniform and driving a marked PSP vehicle.  (*Id.*)  At about 1:45 p.m., the four Troopers drove on to the property.  (*Id.* at 9.)

Looking for Johnson, the Troopers first approached the garage, located at the top of the long driveway.  (*Id.* at 10.)  The garage door was partially open, and they saw a vehicle with a drop light "on the driver's side door, as if somebody was working on that vehicle." (*Id.*)  The Troopers announced their presence but found no one.  (*Id.*)  Next, they knocked on the doors of the three campers on the property, but did not find Johnson.  (*Id.* at 10–11.)

---

[3] Ives and Hnat were investigating an anonymous tip and did not have a search warrant for the Johnson property.  (N.T. at 35.)

Around the same time that the Troopers arrived, a dark Volkswagen sedan pulled up the driveway, and a male passenger exited the vehicle. (*Id.* at 11.) The Troopers spoke with the man, who identified himself as Edwin Blaisure. (*Id.*) Blaisure indicated to the Troopers that he was also there to see Johnson, but that he did not know where Johnson was. (*Id.*) The Troopers ran Blaisure's name through the National Crime Information Center ("NCIC") database and learned he had an active arrest warrant in Broome County, New York. (*Id.*) Ives testified that Blaisure was thereafter "place[d] . . . in custody" (*id.*); surveillance video indicates he was handcuffed but remained at the scene. (*See* Gov't Ex. 21.)

Ives testified that another vehicle then arrived on the property:

**Q.** And as Mr. [Blaisure] is taken into custody, did another vehicle appear on the property?

**A.** It did.

. . .

**A.** As we placed Mr. [Blaisure] in custody, it was myself, Trooper Hnat, Sergeant Horan and Trooper McGrath. As we placed him in custody, we were standing in the driveway in the down-pouring rain, and at that time, we noticed a vehicle approaching, coming traveling up the driveway.

. . .

**Q.** So can you tell us about this vehicle?

**A.** Sure. So as we are standing at the top of the driveway, we notice a vehicle approaching, traveling up the driveway, it turns at the L, at the corner of the driveway, and starts proceeding towards our direction, at which time, it abruptly

4

stops, I'm going to estimate, approximately, 50 yards or so from our location. It makes an abrupt stop, it begins to back up, and then the vehicle becomes stuck along the roadway.

**Q.** Let me stop you there. Did you notice anything about the vehicle, in particular?

**A.** It was a dark vehicle, we couldn't see inside the vehicle, extremely dark, the windows were tinted.

**Q.** Had you located Clifford Johnson yet?

**A.** No, we have not.

**Q.** Could you tell who was in this vehicle?

**A.** No, we had no idea who was inside the vehicle.

**Q.** So what happens to the vehicle?

**A.** The vehicle becomes stuck, as it begins to back up, and it appeared that it was attempting to do a three-point turn to turn around to exit the driveway. In doing so, the rear of the vehicle came off the gravel roadway and became stuck.

(*Id.* at 12–13.)  Ives testified further,

**A.** . . . [F]rom where I was standing in the driveway, I could see that the front passenger had exited the vehicle and made his way to rear of the vehicle. In the meantime, as I see that, Trooper McGrath and Trooper Hnat enter the vehicle, enter Trooper McGrath's vehicle, which is facing the garage, at this point. They enter their vehicle, they turn it around, and they travel down the driveway towards the black, it was a black Chrysler, I believe, 300 that was later identified as being stuck. As they approached the vehicle, I could see the person that was attempting to push the vehicle now flee into the wooded area.

**Q.** From what side of the vehicle did this person exit the vehicle?

**A.** He exited the front passenger side of the vehicle.

**Q.** What did he attempt to do to the car itself?

**A.** Push it from the rear of the vehicle.

**Q.** Was he successful?

**A.** No, no, he was not.

**Q.** What did he then do?

**A.** He then fled into the wooded area.

(*Id.* at 13–14.)  Ives' testimony is corroborated by video captured by a surveillance camera on the Johnson property.  (*See* Gov't Ex. 21.)

McGrath testified that when he saw the Chrysler get stuck in the driveway, he and Hnat entered an unmarked PSP vehicle to approach it.  (*Id.* at 56.)[4]  He explained why:

> Due to the area we were at, due to the totality of the circumstances, given my knowledge of it being an area involved in high crime,[5] the remote location and rural location of this property, there's not common traffic that comes and goes. This is a specific area that one would need to be familiar with to even come across.
>
> In my knowledge, that coupled with the investigation I was assisting on, already having one individual in custody, and then seeing this vehicle approach, I then entered the State Police vehicle and approached that vehicle to make further contact.

(*Id.* at 57.)

---

[4] While Ives recounts seeing the individual flee into the woods, he testified that neither McGrath nor Hnat observed the individual fleeing before they drove towards the Chrysler, nor did they initially realize that a passenger had left the Chrysler when they reached it.  (N.T. at 40.)

[5] McGrath and Ives testified to at least a general awareness of Clifford Johnson's extensive criminal history.  (*See, e.g.,* N.T. at 62–63 (McGrath explained "there was knowledge prior to this incident" of criminal activity on the Johnson property, but acknowledging he had never made an arrest there.).)

McGrath and Hnat drove toward the Chrysler and parked their vehicle parallel to it. (Gov't Ex. 21 at 0:45–1:13.) When McGrath reached the vehicle, he "briefly engaged" with the driver before he looked up and "observed a figure a distance out into the woods." (*Id.* at 58.) The testimony suggests that this was the first time McGrath and Hnat had noticed this individual. Next, both Troopers "entered the woods and began making verbal commands for this individual to stop." (*Id.*) Specifically, McGrath was "identifying [him]self as a State Trooper and ordering him to stop and to come out." (*Id.* at 59.) McGrath estimated that he went between 100 and 200 yards into the woods before apprehending the individual without resistance. (*Id.* at 59.) "And upon making contact with the individual, he was placed into handcuffs, asked who he was, and why he ran." (*Id.* at 58.)[6] Neither Trooper read the individual his *Miranda* rights at this time.

The individual, later identified as the Defendant, responded that "he ran because he had marijuana on him that he told [McGrath] he had discarded into the woods, and that he was, also, on parole and didn't want to get in trouble and violate his parole for possessing the marijuana." (*Id.* at 59–60.) He indicated that he had thrown the marijuana in the woods, though the Troopers were not able to locate any. (*Id.* at 60.) McGrath then escorted Defendant, still handcuffed, out of the woods. (*Id.* at 60–61.)

---

[6] Notwithstanding this testimony describing the events in this order, McGrath also testified, "I don't recall if he was immediately placed into handcuffs or was placed into handcuffs after having the interaction in which he" explained why he ran. (N.T. at 68.)

Meanwhile, Ives and Horan had approached the Chrysler. (*Id.* at 16.) Ives testified that it was a black Chrysler 300 with "heavily tinted windows." (*Id.*) Ives approached the driver, "identified [him]self as a Pennsylvania State Trooper and asked him what he was doing and what was going on." (*Id.*) Ives asked the driver for identification, but the driver had none; Ives then gave him a note pad on which to document his contact information. (*Id.* at 16–17.) The driver identified himself as Heriberto Lebron Delmoral from Bridgeport, Pennsylvania. (*Id.* at 17; Gov't Ex. 20.) Two more individuals sat in the back seat: a woman identified as Alisha Denise Blye, of Fountainville, Pennsylvania, and her child. (*Id.* at 17.) Delmoral and Blye were instructed to remain in the vehicle; Ives testified that they were "being detained at that point." (*Id.* at 44–46.)

Ives asked Delmoral, the driver, what he was doing there. (*Id.* at 18.) Delmoral told Ives that he was there to have his driver's side mirror repaired, and that his passenger, the Defendant, "was checking on a vehicle that he had brought up earlier that was being painted." (*Id.*) Ives testified that he found it unusual that these individuals had traveled from the Philadelphia area to this location, a "[f]ive-hour round trip," for car repairs. (*Id.* at 51.)

During his conversation with Delmoral, Ives testified that he observed no illegal activity inside the Chrysler—no evidence of the stolen vehicles that were the subject of the original investigation, nor of other contraband. (*Id.* at 44.) However, Delmoral's mannerisms stuck out to Ives:

> **Q.** Did you notice anything about the driver, Mr. Delmoral's, mannerisms?

8

**A.** Yes, it was very clear, as I spoke with Mr. Delmoral, him and I were conversing, and he began to nod his head and wink towards me. And I actually called him out on it, that if he had an issue, because he was starting to make me nervous, based on some of his gestures, and I received the impression that he wanted to talk to me, but since there was [sic] other people in the vehicle, he wanted to provide some more information but did not, at that time.

**Q.** Did you find his mannerisms unusual?

**A.** Yes, extremely.

(*Id.* at 18.)

Another Trooper, Corporal John Waznak, arrived on the scene around this time, at 2:15 p.m. (*Id.* at 79.) He parked his patrol car, which was equipped with a Mobile Video Recorder ("MVR"), behind the Chrysler. Ives "had a short conversation with him about his interactions with the occupants inside the vehicle." (*Id.* at 22.) Hnat also relayed to Waznak that the Defendant had fled into the woods, had been detained, and when asked, responded that he ran because he was on parole and had marijuana on him. (*Id.* at 83–84.)

Upon escorting Defendant out of the woods, McGrath and Hnat placed him on the front bumper of Waznak's vehicle, within the frame of the MVR.[7] (*Id.* at 19.) Waznak then conducted a pat-down of the Defendant, who was still in handcuffs. (*Id.* at 85.) Troopers explained to Defendant that he was being patted down because he "ran for no reason," and Defendant replied, "Because I had that weed and I'm on parole . . . I can't afford it." (MVR at 1:50–2:05.)

---

[7] The MVR includes audio, but due to the heavy rain, it is often difficult to understand.

Waznak testified that during the pat-down, he "observed the tops of two cellular telephones in Mr. Brown's right front pants pocket" and "removed these cell phones from his pocket . . . [and] handed them to Trooper McGrath for safe-keeping [in] the dry interior of the patrol vehicle." (*Id.* at 85–86.) Waznak also testified, "Two cellular telephones, in my training and experience, is often associated with trafficking of contraband." (*Id.* at 85.) Waznak also recovered loose currency and a phone charger. (*Id.* at 119.)

During the course of the pat-down, Troopers continued questioning Defendant. One Trooper asked, "If you live in Norristown, why are you getting repair work done [here]?" (MVR at 2:00–2:10.) Defendant responded, "Cause I know him, I got another car up here getting fixed already." (*Id.*) The Trooper asked which car was his, and Defendant said, "It's a Range Rover." (*Id.* at 2:10–2:20.) One of the Troopers replied, "I don't see any Range Rovers." (*Id.*) The Troopers also asked him where he was planning to go when he ran, and whether he "know[s] the land up here." (*Id.* at 3:00–3:10.) Defendant shook his head no, laughing. (*Id.*) Defendant was asked several more times why he ran, and each time he responded that he did because he was on parole and he had "weed" or a "roach" on him. He elaborated, "I got caught with paraphernalia, they gave me two 1 1/2 to 3's . . . in Montgomery County" (*id.* at 4:10–4:25), and later indicated that he was incarcerated at State Correctional Institution Dallas (*id.* at 4:35).

Waznak then asked Defendant about his travel that day.  Waznak testified that Defendant indicated his travel originated in Norristown, Pennsylvania, a suburb of Philadelphia, and included a stop in Scranton.  (N.T. at 88–89.)

At the Hearing, Waznak testified about the "indicators of criminal activity" he had noticed up to this point.  Waznak noted (1) Clifford Johnson's association with "the movement or possession of contraband"; (2) Defendant's admission that he possessed marijuana and his status as a parolee; (3) that he assumed Defendant, before fleeing, had been "inside of the black Chrysler with the drugs that he was admitting to possessing"; and (4) Defendant's possession of two cell phones.  (*Id.* at 90–91.)

Waznak then turned his attention to the occupants of the Chrysler.  Waznak testified that he found it suspicious that Delmoral and Blye had traveled "a significant distance" from Norristown to the Johnson property without any form of identification.  (*Id.* at 92, 93.)  He also testified that he noticed "an excessive amount of window tint on the vehicle."  (*Id.* at 93.)  Indeed, Waznak can be heard on the MVR stating, "That thing can double as a limousine, there's so much tint on that." (MVR at 11:55.)

About twelve minutes into the MVR (and after Waznak's arrival), Waznak asked Delmoral to exit the vehicle.  (*Id.*)  He asked Delmoral about the group's travel:

**Q.** Can you tell us what the response was?

**A.** Mr. Delmoral indicated that . . . the occupants of the black Chrysler began their trip at, approximately, 1015 hours on this date or 10:15 a.m.

**Q.** Did you ask him about making any stops?

11

**A.** I did.

**Q.** What did he tell you?

**A.** Mr. Delmoral indicated that the black Chrysler sedan made two stops, brief in nature, on its way from Norristown to this location.[8]

**Q.** Did that time frame seem consistent to you, based on your training and experience?

**A.** It did not. At this point of the interaction, I noted that it was, approximately, 1420 or 2:20 p.m., again, reminding the Court that Mr. Delmoral identified the time of departure as 10:15 a.m., that's, approximately, four hours and five minutes difference or time-elapsed. In my experience, which includes working as a member of the Pennsylvania State Police in the southeast portion of the state, in the very near area of Norristown, from my experience, that trip has never taken more than two and a half hours to this location. Factoring in the two stops Mr. Delmoral indicated, again, indicating that they were brief in nature, one, I believe, being a stop for Black and Milds for Mr. Brown.

**Q.** What are Black and Milds?

**A.** Generally sold cigars at a convenient store. Even factoring those two brief stops and, again, consider the weather, with rain and wind, if you add 30 minutes to the two and a half hours which it should have taken, you're now at three hours, and we still have one hour that's unaccounted for. That description of travel, I identified as an indicator of criminal activity, based on my training and experience and the totality of the circumstances.

(N.T. at 97–99.) Waznak noted further that the group's planned "immediate turn-around returning to Norristown" was suspicious, explaining at the Hearing that the "short quick turn-around in trip, especially, in a significant duration like that, is commonly associated with

---

[8] On the MVR, Waznak can be heard at least twice summarizing his conversation with Delmoral and stating that the vehicle made three stops, not two. (*E.g.,* MVR at 16:50.)

trafficking and contraband, usually, for the purposes of limiting potential law enforcement contact." (*Id.* at 103.)

Waznak also testified that Delmoral told him he was paid $200 to drive to this location. (*Id.* at 99.) Waznak identified this as another "indicator of criminal activity, wherein, the transfer of money is commonly associated with the trafficking of contraband, especially, to the operator of a motor vehicle or courier . . . to assume the risk, ultimately, of the trip and the potential cargo." (*Id.*) Waznak also noticed certain of Delmoral's mannerisms, *e.g.*, diversion of attention toward the Defendant and lack of eye contact, as Ives had earlier. (*Id.* at 100.)

Next, Waznak testified that Delmoral "identified himself as the registered owner of the black Chrysler sedan." (*Id.* at 101.) Waznak asked Delmoral if there was "anything illegal inside [the] vehicle," and Delmoral responded, "Not that I know of." (*Id.*; MVR at 17:12–15.) Waznak considered this response suspicious because "Mr. Delmoral was verbally separating himself from the contents of his operated and owned vehicle." (*Id.*) Waznak followed up, asking, "Can you say with 100 percent certainty that there is nothing illegal inside of this vehicle?" (MVR at 17:43–50.) Delmoral said, "Yeah." (*Id.*)

About eighteen minutes into the MVR, Waznak asked Delmoral for consent to search the vehicle. (*Id.* at 18:02.) He explained that he was seeking consent to search because he was "trying to put it all together here" and some things were not making sense. (*Id.* at 18:12–17.) He told Delmoral,

> For example, it doesn't take four hours to get to this location. There have been multiple stops, one that was already unaccounted for. Since it's your vehicle, you should be able to say with 100 percent certainty there's nothing illegal inside.
>
> . . .
>
> And there's a big to-do going on here. You seem like a good dude, but what [piqued] our interest originally is when you pulled in here and your passenger ran away.

(N.T. at 128–29.)  Delmoral denied consent.  (*Id.* at 102.)  Waznak then consulted with Hnat, and the two decided to summon the Canine Unit.  (*Id.* at 107.)

Hnat called for the Canine Unit at around 2:40 p.m., which was approximately twenty minutes after Waznak had arrived on the scene.  (*Id.* at 148.)  Trooper Jason Rogowski, then a PSP Canine Handler, and his canine, Khan, arrived at the scene at approximately 3:20 p.m., forty minutes later.  (*Id.*)

Rogowksi testified that, upon arriving, he had a conversation with Waznak about his basis for calling for a canine.  (*Id.* at 159.)  While he did not recall the substance of that conversation, he testified, "[W]hatever it was, I deployed the dog, so in my opinion, they had enough reasonable suspicion, based on everything that was going on that day."  (*Id.*)  About ten minutes after arriving, Rogowski deployed Khan.  (*See* MVR at 1:07.)

First, Rogowski and Khan did a "first pass" where the dog was "searching the vehicle on his own" without any input or direction from Rogowski.  (N.T. at 152.)  Rogowski testified that he observed Khan alert near the rear passenger side, trunk, and rear bumper;

14

specifically, Rogowski observed that Khan had "a change in body posture, he put[] on the brakes, spun around," and snapped his head. (*Id.*)

They did another lap around the vehicle, and Rogowski observed Khan alert on the passenger side front door. He explained that he saw Khan's "tail kind of speed up a little bit." (*Id.* at 153.) Finally, Rogowski and Khan did a third lap in the reverse direction. (*Id.* at 154.) Rogowski did not observe Khan alert on the reverse lap. (*Id.*)

Following Khan's alerts, Troopers Rogowski, Waznak, and Horan proceeded to search the Chrysler. (*Id.* at 155.) Within fifteen minutes, the Troopers located a tote bag in the spare tire compartment of the Chrysler's trunk. (*Id.* at 110.) Inside the tote bag were four black plastic wrapped cylindrical items containing crystal methamphetamine. (*Id.* at 110–11.) Delmoral, Blye, and Defendant were thereafter arrested and charged with state drug trafficking offenses. (Doc. 139 at 18.)[9]

The investigation continued after April 30, 2020, with law enforcement executing controlled purchases at the Johnson property. (*Id.* at 19.) A search warrant was obtained and executed on August 10, 2020; additional methamphetamine was seized and Johnson was arrested. (*Id.*) Johnson identified Defendant as his source for methamphetamine, and Delmoral and Blye also provided statements implicating the Defendant. (*Id.*)

---

[9] Soon thereafter, at about 4:00 p.m., the Troopers located Johnson when he emerged from one of the campers on the property. (N.T. at 47.) Ultimately, a stolen trailer, two stolen snowmobiles, and a stolen ATV were recovered from the Johnson property that day. (*Id.* at 48–49.)

The case was later adopted for federal prosecution, and Defendant and Johnson were indicted by a federal grand jury on October 13, 2020.  Defendant is charged with one count of Conspiracy to Distribute and Possess with Intent to Distribute more than 500 grams of Methamphetamine, a Scheduled II Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A), and a second count of Possession with Intent to Distribute more than 500 grams of Methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  (Doc. 1.)

### III. ANALYSIS

In his post-hearing brief, Defendant maintains that the Government has not satisfied its burden of showing that law enforcement had (1) reasonable suspicion to detain him; (2) "reasonable suspicion or probable cause to seize the vehicle in which [he] was a passenger"; (3) reasonable suspicion to "prolong[] the stop to investigate other crimes and to call for a canine unit to perform a sniff-search"; or (4) probable cause to search the car. (Doc. 140 at 15.)  His Motion also seeks to suppress the statements he made to law enforcement that day.  (Doc. 113.)  The Government contends it has met its burden with respect to the physical evidence and Defendant's statements, further argues that Defendant lacks standing to challenge the search of the vehicle, and concludes that Defendant's motion should be denied.  (*See* Doc. 139.)

16

### A. Fourth Amendment

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures." U.S. Const. amend. IV. "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Here, because the search and seizures at issue occurred without warrants, the Government bears the burden of demonstrating reasonableness. *See United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (first citing *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); then citing *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002); and then citing *Johnson*, 63 F.3d at 245) ("The Government bears the burden of showing (and presenting evidence) that the traffic stop was reasonable.").

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "While

'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123.  Moreover, to lawfully conduct an investigatory or "*Terry* stop," an officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 27, 28 (1968)).

Finally, under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974).  The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348; *United States v. Leon*, 468 U.S. 897, 906 (1984).  Under Supreme Court precedent, "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Utah v. Streiff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).[10]

---

[10] *But see United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) ("the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before Miranda warnings are issued").

### 1. Standing

As an initial matter, while the Government correctly asserts that Defendant lacks

Fourth Amendment standing to directly challenge the search of the vehicle, he does have

standing to challenge his own seizure and, if unlawful, any evidence derivative of it.  The

Third Circuit discussed a passenger's lack of standing to directly challenge a vehicle search

in *United States v. Mosley*:

> Passengers in cars, unlike owners or licensees, have no reasonable
> expectation of privacy in the interior of the vehicle in which they are riding.
> Because the Fourth Amendment's protection against unreasonable searches
> is predicated on the invasion by the government of a person's reasonable
> expectation of privacy, passengers are generally held to lack "standing" to
> object to evidence discovered in a search of a vehicle. *See Rakas v. Illinois,*
> 439 U.S. 128, 99 S. Ct. 421, 58 L.Ed.2d 387 (1978). Fourth Amendment rights
> are personal rights, and a search of a car does not implicate the rights of non-
> owner passengers: the car is treated conceptually like a large piece of clothing
> worn by the driver.

454 F.3d 249, 252–53 (3d Cir. 2006) (footnote omitted).  Here, as a non-owner passenger,

Defendant had no reasonable expectation of privacy in the Chrysler itself.[11]

---

[11] The Court is not persuaded by Defendant's argument that his $200 payment to Delmoral establishes standing.  First, Defendant cites no Third Circuit case law to support a taxi passenger's expectation of privacy in a taxi, and the Court's own research indicates courts in this Circuit have expressly rejected such notion. *See United States v. Scott*, No. CR 05-113-2, 2006 WL 8440857, at *10 n.12 (E.D. Pa. Oct. 13, 2006) ("Defendant lacks standing to challenge the seizure of items found in the backseat of the taxi because he does not have [a] reasonable expectation of privacy for that area") (citing *Rakas*, 439 U.S. at 133–34).

Even assuming *arguendo* that a passenger has a reasonable expectation of privacy in the passenger area of a taxi or livery car, and assuming further that a passenger's payment to an acquaintance to drive that passenger somewhere renders that vehicle a taxi or livery car, Defendant cites no support for extending the expectation of privacy to the *trunk* of a taxi. *Cf. United States v. Dardy*, 128 F. Supp. 3d 400, 407 (D. Mass. 2015) ("Some courts in other circuits have recognized such a privacy expectation for a paying taxi passenger in the *rear passenger area*." (emphasis added)).  As such, this payment did not establish standing for Defendant to directly challenge the search of the vehicle.

However, the *Mosley* court clarified that a different outcome may result when an

illegal *seizure* is at issue. The court explained,

> The search of the car is not before us; the seizure of Mosley is. This case is
> about an illegal seizure by the police of the defendant, pursuant to which
> evidence was discovered. The violation of Mosley's Fourth Amendment rights
> was the traffic stop itself, and it is settled law that a traffic stop is a seizure of
> everyone in the stopped vehicle, *see Delaware v. Prouse,* 440 U.S. 648, 653,
> 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979). Thus passengers in an illegally stopped
> vehicle have "standing" to object to the stop, and may seek to suppress the
> evidentiary fruits of that illegal seizure under the fruit of the poisonous tree
> doctrine, as expounded in the line of cases following *Wong Sun v. United
> States,* 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963). The dispositive legal
> issue is the causal relationship between the traffic stop and the discovery of
> the evidence: whether the evidence found in the car was "fruit" of the illegal
> stop.

*Id.* at 253 (footnotes omitted). In other words, an individual may have standing to challenge

the fruits of an illegal search of a vehicle in which he is a passenger if that vehicle "is

illegally stopped by the police . . . [and] the government [fails to] show that the taint of the

illegal stop was purged." *Id.* at 251.

Setting aside whether any unlawful seizure occurred, there are complicating factors

here. First, as discussed further *infra*, no textbook "traffic stop" occurred. To be sure, the

vehicle and all of its original occupants were, at some point, seized. Defendant was

certainly not "free to leave" as soon as he was handcuffed. (N.T. at 58); *United States v.

Mendenhall,* 446 U.S. 544, 554 (1980) ([A] person has been 'seized' within the meaning of

the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a

reasonable person would have believed that he was not free to leave."). The Chrysler and

20

its then-occupants—Delmoral, Blye, and her child—were seized when they were initially instructed to remain in the vehicle. (N.T. at 44–46 (Ives acknowledging that the occupants were being detained).) But the Chrysler was not stopped to enforce a traffic infraction; it came to a stop on its own, and the Troopers approached thereafter.

Second, and relatedly, by the time the Troopers approached the Chrysler, Defendant was no longer an occupant. He was handcuffed—and, accordingly, seized—in the woods on the Johnson property, 100 to 200 yards from the driveway where the Chrysler was seized almost simultaneously. This fact is fatal to Defendant's argument. While he has standing to challenge the fruits of an unlawful seizure of his person, he has no standing to suppress the fruit of an unlawful stop of a vehicle in which he was no longer riding. By fleeing from the vehicle, Defendant logically separated himself from the fruits of its seizure— even if the Chrysler was seized illegally, Defendant was not seized with it. At the same time, if Defendant himself was illegally seized, the discovery of the contraband was not causally linked.

Though not sufficient, but-for causality is a necessary condition for suppression, and Defendant cannot establish that but for the seizure of his *person*, the *vehicle* would not have been searched. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006). The testimony indicates that the Troopers who initially approached the Chrysler—McGrath and Hnat—did so without observing Defendant fleeing into the woods. Therefore, any argument that the vehicle would not have been seized but for Defendant's seizure is hardly persuasive,

because the Troopers initiated their contact with the vehicle separately from their pursuit of

Defendant.  Rather, while Defendant may have had standing to challenge the fruit of an

unlawful seizure of the Chrysler *had he remained inside of it*, he abandoned that standing

when he abandoned the vehicle.

Defendant contends he did not abandon the vehicle because, although he fled, it

was the Troopers who kept him from returning.  (*See* Doc. 140 at 29 ("Indeed, but for being

illegally approached and detained by the Troopers, Brown would have had no reason to

leave or not return to the vehicle.").)  Citing *United States v. Moody*, Defendant argues that

abandonment depends on the "possessor's intent" and the party relying on it must establish

by clear and unequivocal evidence that the possessor intended to abandon the vehicle.  (*Id.*

at 26 (citing 485 F.2d 531, 534 (3d Cir. 1973).)  In *Moody*, the Third Circuit held that the

Government failed to satisfy its burden of proving intent to abandon when the defendant

stopped his vehicle in a traffic lane and fled upon realizing that undercover officers were

following him.  *See* 485 F.2d at 534.[12]

---

[12] The *Moody* court explained,

> On these facts one could reasonably reach two conclusions: that he knew he was being
> followed by law enforcement agents and was seeking both to avoid arrest and abandon the
> incriminating evidence in the trunk of his car; or, that he believed he was being pursued by
> private citizens who intended to do him harm, and that he only left his car temporarily in
> order to escape this danger.

*Id.*  Because the defendant's intent was ambiguous, and because "only the former state of mind would
constitute an abandonment," the court held the evidence failed to establish that "the car and its contents
were abandoned."  *Id.*

Defendant argues that "Brown's actions, including entering a heavily wooded area during a rainstorm, having nowhere to run or hide, and immediately obeying the Trooper's commands, demonstrate that Brown's intent was to discard the marijuana in the woods and then return to the car." (Doc. 140 at 27.)  But even if Brown intended to return to the Chrysler, the fact remains that the vehicle was not seized until after he fled from it.  As a passenger, his only hope for establishing standing to challenge the vehicle search was to be in the vehicle at the moment it was seized; it does not matter whether he intended to return to the vehicle if it was seized without him in it.  *Cf. Moody*, 485 F.2d at 533 (defendant was driver of vehicle).)

Accordingly, Defendant has standing only to challenge the fruits of any unlawful seizure of his person.  As set forth *infra*, even assuming *arguendo* that he also has standing to challenge the fruits of the seizure of the vehicle, each seizure was supported by reasonable suspicion and the search was supported by probable cause, so no Fourth Amendment violation occurred.

### *2. Initial Stop of Chrysler*

The Court considers each development in turn, starting with the Troopers' initial seizure of the Chrysler.  To be a lawful *Terry* stop, the initial stop must have been supported by reasonable suspicion.  As explained by the Supreme Court in *c*, because reasonable suspicion is a "less demanding" standard than probable cause, it

> "can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325,

330, 110 S. Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [*Navarette v. California*, 572 U.S. 393, 402, 134 S. Ct. 1683, 1690, 188 L. Ed. 2d 680 (2014)] (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty . . . where none exists." [*Wardlow*, 528 U.S. at 125, 120 S. Ct. at 145]. Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; *see also Navarette*, *supra*, at 403, 134 S. Ct. 1683 (noting that an officer "'need not rule out the possibility of innocent conduct'").

—— U.S. ——, 140 S. Ct. 1183, 1187–88, 206 L.Ed.2d 412 (2020).  Stating that Supreme Court "precedents . . . repeatedly affirmed that the ultimate touchstone of the Fourth Amendment is reasonableness," the Court emphasized that "[t]he standard takes into account the totality of the circumstances—the whole picture."  *Id.* at 1191 (internal quotations and citations omitted).

By adopting a "totality of the circumstances" approach, the Supreme Court has rejected a "divide-and-conquer analysis."  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Instead, "the whole picture must be taken into account," *United States v. Cortez*, 449 U.S. 411, 417 (1981), and although any single factor may not "by itself [be] proof of any illegal conduct," and may in fact be "quite consistent with innocent travel," considered together, the factors may amount to reasonable suspicion.  *United States v. Sokolow*, 490 U.S. 1 (1980).  Finally, courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion."  *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018).

With these principles in mind, the Government asserts that several factors supported the Troopers' formation of reasonable suspicion justifying their initial stop of the Chrysler, and the Court agrees.  The Government first points to the location, for three reasons.  First, when the Chrysler arrived, the Troopers were already on the property investigating a tip regarding stolen property.  Second, the Troopers testified that, due in part to Johnson's extensive criminal history, the property is known to local law enforcement as "an area involved in high crime" and "a haven for illegal activity, especially regarding drugs and stolen property."  (N.T. at 57, 62.)  Indeed, the Troopers had only been on the property for a matter of minutes when the Chrysler arrived, and they had already arrested one visitor, Blaisure.  Third, the "extremely rural" location of the property means "that one would need to be familiar with [it] to even come across [it]."  (*Id.* at 57.)  It follows that the occupants of the Chrysler were intentionally visiting an area that was both generally associated with crime and specifically the subject of investigation at that exact time.  As the Government asserts, presence in an area with high crime rates can contribute to the formation of reasonable suspicion, in combination with other indicia of criminal activity.  *See Wardlow*, 528 U.S. at 124.

Furthermore, although this was not a traditional traffic stop, the Government notes that the "Chrysler had heavily tinted windows, in violation of the Pennsylvania Vehicle Code."  (Doc. 139 at 30 (citing 75 Pa. C.S.A. § 4524(e)(1)).)  The window tint contributes to reasonable suspicion in several ways.  First, had the vehicle been driving on a roadway, the

25

Troopers would have had reasonable suspicion of a traffic violation, justifying a traffic stop. *See United States v. Caraballo*, 643 F. App'x 163, 158 (3d Cir. 2016) (non-precedential); *United States v. Meran*, No. CR 16-222, 2017 WL 4803927, at *7 (W.D. Pa. Oct. 23, 2017) ("The police have reasonable suspicion justifying a traffic stop when a vehicle has dark tinted windows in violation of Pennsylvania law.")  Tinted windows are also associated with drug trafficking and have been held to contribute to reasonable suspicion that a vehicle is being used to for that purpose.  *See United States v. Stanger*, No. 4:21-CR-00264, 2023 WL 1071648 at *5 (M.D. Pa. January 27, 2023); *Meran*, 2017 WL 4803927, at *3 (W.D. Pa. 2017) (officer stating that "window tint is common on vehicles used to transport contraband").  Finally, the tinted windows made it difficult for the Troopers to see who was inside the Chrysler.  Because the Troopers had not yet located Johnson at this point, they were especially interested in the identity of the occupants.

Considered in totality, these factors give rise to reasonable suspicion.  While the initial approach of the Chrysler may not have been a traditional *Terry* stop, the occupants of the Chrysler were soon thereafter detained when they were told to remain in the vehicle. (N.T. at 44–46.)  That detention, a seizure under the Fourth Amendment, was justified.

### 3. Initial Stop of Defendant

The initial stop of Defendant was also justified by reasonable suspicion.  At the outset, many of the factors that contributed to reasonable suspicion to justify stopping the Chrysler also serve to justify stopping Defendant.  First, Defendant came to the Johnson

property, a location that was currently the subject of a stolen property investigation, an area known for crime, and an extremely rural, secluded property that he would not likely have visited by accident. Second, Defendant arrived in a vehicle with tinted windows, indicative of transporting contraband. And third, the Troopers did not know whether Johnson was in the vehicle.

After they approached the Chrysler, McGrath and Hnat came to realize that an individual had fled from the vehicle and into the woods. To be sure, as Defendant argues, his "flight into the woods standing alone is not enough to justify a Terry stop." (Doc. 140 at 20.) Indeed, "the Supreme Court has never held that unprovoked flight alone is enough to justify a stop." *United States v. Navedo*, 694 F.3d 463, 472 (3d Cir. 2012) (quoting *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004)). But "flight upon noticing police, *plus some other indicia of wrongdoing,* can constitute reasonable suspicion." *Id.* (emphasis in original) (quoting *Bonner*, 363 F.3d at 217). As the *Wardlow* court noted, "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. Defendant's flight was especially suspicious given the rural location and the inclement conditions that day—there was no rational justification for him to run into the woods, except to evade the police.

Combined with the aforementioned factors, which surely qualify as "other indicia of wrongdoing," *Navedo*, 694 F.3d at 472, Defendant's flight served to bolster the Troopers' level of suspicion. The initial stop of Defendant was therefore justified.

### 4. Length of Detention

Next, Defendant contends that the stop became unlawful when it was "unreasonably prolonged . . . to investigate other crimes." (Doc. 140 at 42.) Defendant cites *Rodriguez v. United States,* 575 U.S. 348 (2015), arguing, "Even if the Troopers were justified in briefly detaining the Chrysler sedan and its occupants for the limited purpose of locating Johnson or for reasons of officer safety, the [*Rodriguez*] moment occurred when they extended the stop and began a drug trafficking investigation." (Doc. 140 at 43.) Notably, *Rodriguez* concerns the extension of *traffic* stops, and as noted *supra*, the stop at issue was not a typical traffic stop in the sense that no one was pulled over and the encounter occurred in a private driveway. The Court therefore has reservations as to whether *Rodriguez* and its progeny are properly applied here, but applies it because Defendant has raised it.[13] In any

---

[13] Without deciding whether it is properly applied here, the Court acknowledges limited support for the application of *Rodriguez* outside of the context of a typical stop related to a moving violation.

For example, in a Section 1983 action challenging the constitutionality of a prolonged street stop of the plaintiff-panhandlers, the Seventh Circuit acknowledged it was not a traffic stop but adopted the Tenth Circuit's reasoning and applied *Rodriguez* and its progeny in that context. *See Hall v. City of Chicago*, 953 F.3d 945, 952–54 (7th Cir. 2020) (quoting *United States v. Villagrana–Flores*, 467 F.3d 1269, 1277 (10th Cir. 2006)). This street stop is akin to the stop of Defendant on foot.

In a non-precedential opinion, the Ninth Circuit also applied *Rodriguez* when officers approached a parked vehicle on foot and "[t]he initial contact between the officers and [the plaintiff] was not a Fourth Amendment stop." *United States v. Lopez*, 757 F. App'x 586, 589 (9th Cir. 2018). The officers were investigating a 911 call reporting a suspicious vehicle but "did not activate their lights or sirens, parked a full car's length in front of Lopez's already-parked vehicle, and approached on foot." *Id.* at 589. The Ninth

event, the length of the investigatory stop was permissible under the Fourth Amendment whether or not *Rodriguez* applies.

The Third Circuit recently discussed the permissibility of the extension of a traffic stop in *United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022). *Hurtt* first noted that "[e]ven if an officer lawfully stops a suspect at first, 'it could become "unreasonable," and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time.'" 31 F.4th at 159 (quoting *Clark*, 902 F.3d at 409). *Hurtt* then looked to *Rodriguez,* where

> the Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." [575 U.S. at 350.] Thus, "a seizure justified only by a police-observed traffic violation, . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission." [*Id.* at 350–51.]

*Hurtt*, 31 F.4th at 159.[14]

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez,* 575 U.S. at 355). *Green* explained that, pursuant to *Rodriguez*, "we must first determine when the stop was measurably extended. . . . After determining when the stop was extended—the

---

Circuit applied *Rodriguez* to determine the "tolerable duration" of the stop. *Id.* This extended detention of an already-stopped vehicle is akin to the stop of the Chrysler.

[14] Citations footnoted in *Hurtt* are bracketed in this opinion.

'*Rodriguez* moment,' so to speak—we can assess whether the facts available to [the officer]

at that time were sufficient to establish reasonable suspicion." *Id.* After the *Rodriguez*

moment,

> "nothing later in the stop can inform our reasonable suspicion analysis."
> [*Green*, 897 F.3d at 182.] In short, we ask whether the mission of the traffic
> stop was continuously carried out before the discovery of evidence giving rise
> to a reasonable suspicion of criminality. Any break in that mission taints the
> stop because it is the result of an unreasonable delay. [*See, e.g.*, *United States
> v. Garner*, 961 F.3d 264, 271–72 (3d Cir. 2020) (holding that there was no
> unlawful extension of the traffic stop because the officer "had reasonable
> suspicion to extend the stop based on information he obtained during the first
> few minutes of the traffic stop"); *Yoc-Us v. Att'y Gen.*, 932 F.3d 98, 105–06 (3d
> Cir. 2019) (holding that the officer was justified for first stopping the van for
> speeding but that it was an unlawful extension to investigate the immigration
> status of the passengers); *Clark*, 902 F.3d at 410–11 (questioning the
> passenger after receiving information from dispatch impermissibly extended
> the stop because the traffic stop's mission "to address the traffic violation that
> warranted the stop" was complete).]

*Hurtt*, 31 F.4th at 159.

Importantly, when it comes to inquiries unrelated to the traffic stop, "there is no *de*

*minimus* exception to" the *Rodriguez* rule. *Clark*, 902 F.3d at 410 (citing *Rodriguez*, 575

U.S. at 357). In describing what inquiries qualify as unrelated to a traffic stop, *Rodriguez*

noted that ordinary inquiries "involve checking the driver's license, determining whether

there are outstanding warrants against the driver, and inspecting the automobile's

registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The Third Circuit has

further held that "some questions relating to a driver's travel plans ordinarily fall within the

scope of the traffic stop, as do delays caused by safety concerns related to the stop."

*Garner*, 961 F.3d at 271 (first citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); and then citing *Clark*, 902 F.3d at 410).

"In performing these on-mission tasks, '[o]fficers should be reasonably diligent,' and 'the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it.'" *Hurtt*, 31 F.4th at 160 (quoting *United States v. Yusuf*, 993 F.3d 167, 182 (3d Cir. 2021) (internal quotation omitted)). As stated in *Garner*, "[t]o lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." 961 F.3d at 271 (first citing *Rodriguez*, 575 U.S. at 355; and then citing *Clark*, 902 F.3d at 410). If the officer possessed reasonable suspicion of criminal activity prior to extending the traffic stop, no violation of the Fourth Amendment has occurred. *See id*.

When reviewing the allegation that a traffic stop was improperly extended, a court is to "review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable." *Clark*, 902 F.3d at 409 (citing *United States v. Delfin-Colina*, 464 F.3d 392, 397–98 (3d Cir. 2006)).

Here, the testimony indicates that the Troopers had two "missions" when they initially approached the Chrysler and apprehended the Defendant: to continue investigating the stolen vehicle tip that brought them to the Johnson property in the first place, and to

31

investigate a general suspicion of criminal activity established by the high crime area, the fact that the most recent visitor to the property had an active arrest warrant, the rural location, the tinted windows on the Chrysler, and Defendant's flight. The question under *Rodriguez* is whether, and at what point, the Troopers deviated from those missions and "measurably extended" the stop.

The first mission was completed as soon as the Troopers identified the occupants of the vehicle. Of course, the stolen vehicles themselves could not logically be concealed in the Chrysler. But the Troopers also wanted to locate Johnson, and they could not see through the tinted windows to determine whether he was inside. However, as soon they confirmed that Johnson was not in the vehicle, their suspicion with respect to the first mission had been resolved. This was also the point at which Ives testified the vehicle occupants were "being detained" (N.T. at 44–46), and that Defendant was handcuffed.

Defendant argues this was the "*Rodriguez* moment."[15] The Court agrees—but only with respect to the first of the Troopers' two missions. Crucially, the Troopers had a second purpose for approaching the vehicle, and that purpose remained unresolved. As such, this is not a typical *Rodriguez* moment wherein officers resolve the traffic-based purpose of their stop and begin investigating crimes separate from that original mission—instead, the Troopers continued to investigate potential criminal activity consistent with the second of

_____

[15] The Government cites *Rodriguez* but does not propose its interpretation of when the *Rodriguez* moment occurred.

their two original missions.  The extension beyond this point was therefore lawful if the

Troopers still had reasonable suspicion to pursue their second mission, and the evidence

indicates they did.

From the start of their contact with Defendant and the vehicle occupants, the

Troopers had reasonable suspicion that criminal activity beyond the theft of the vehicles

was afoot.  This was established by (1) the high crime area, (2) the fact that the most recent

visitor to the property had an active arrest warrant, (3) the rural location, (4) the tinted

windows as indicators of drug trafficking, and (5) Defendant's flight.  In other words, the

second mission was established independently of the stolen vehicles investigation and

survived after the Troopers learned Johnson was not in the Chrysler.  And as the events

progressed, the Troopers developed more and more suspicion that justified prolonging the

stop, and eventually, calling for a canine.

First, Waznak found it suspicious that Delmoral and Blye had driven several hours

without any driver's license or other form of identification.  (N.T. at 93.)  Defendant's criminal

history immediately added to that suspicion.  When asked why he ran into the woods,

Defendant told the Troopers that he had marijuana on him, that he had been to prison for

possessing drug paraphernalia, and that he was on parole.  In conjunction with other indicia

of criminal activity, a criminal record can contribute to the formation of reasonable suspicion.

See Green, 897 F.3d at 187 (citing United States v. Mathurian, 561 F.3d 170, 177 (3d Cir.

2009)).  Defendant's admission to the possession of a controlled substance certainly contributed as well.

Next, Waznak did a pat-down of Defendant and recovered two cell phones.  He testified that he considered this to be an indicator of criminal activity, specifically the "trafficking of contraband."  (N.T. at 85, 92.)  As the Government notes, courts have frequently recognized the possession of multiple cell phones as a contributing factor for reasonable suspicion.  *See, e.g., United States v. Robinson*, 529 F. App'x 134, 136 (3d Cir. 2013).

Thereafter, Waznak engaged Delmoral in conversation about the group's travel plans, and testified that he found Delmoral's mannerisms suspicious.  This was another valid contributor to reasonable suspicion.  *Wardlow,* 528 U.S. at 124 (collecting cases) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion").

The group's travel plans raised suspicion in several respects.  Notably, questions to Defendant and Delmoral about their travel fell within the scope of a valid investigative stop. *See Garner*, 961 F.3d at 271 (citing *Givan*, 320 F.3d at 459).  Their stated plan was to travel five hours round-trip for car repairs, which the Troopers found unusual.  Defendant said he was there to check on his Range Rover that was being painted, but the Troopers had not seen any such vehicle on the property.

In addition, the trip's timeline raised suspicion based on the Troopers' knowledge of the distance between the Philadelphia area and the Johnson property.  Finally, Waznak

testified that a "short quick turn-around in trip, especially, in a significant duration like that, is commonly associated with trafficking and contraband, usually, for the purposes of limiting potential law enforcement contact." (N.T. at 103.)  Each aspect of these unusual travel plans contributed further to the Troopers' suspicion.

Finally, Delmoral told Waznak he had been paid $200 to make this trip, which Waznak identified as an indicator of criminal activity.  Waznak testified that in his experience, payments such as this are "commonly associated with the trafficking of contraband" and are intended to have the driver "assume the risk . . . of the trip and the potential cargo." (*Id.* at 99.)

In summary, in Waznak's first twenty minutes on the scene, he and the other Troopers remained on-mission, as one of their original missions was to investigate general criminal activity in connection with the arrival of the Chrysler.  The Court finds that they asked reasonable questions under the circumstances and acted diligently to investigate their suspicions.  In doing so, they observed successive indicators of criminal activity, specifically drug trafficking, each of which increased their overall level of suspicion.  When considered in totality, these factors sustained the Troopers' reasonable suspicion that had motivated their initial approach of the Chrysler.

At this point, Waznak asked Delmoral for consent to search the car.  When Delmoral refused, at about 2:40 p.m., Waznak and Hnat made the call to summon the Canine Unit. (N.T. at 148.)  The Canine Unit arrived approximately forty minutes later.  For purposes of

analysis, the Court assumes that the second *Rodriguez* moment, with respect to the

Troopers' second mission, occurred when the Canine Unit was called, because the stop

was thereafter "measurably extended."

To be sure, a dog sniff cannot "be performed in a manner that extends the duration

of the stop absent reasonable suspicion." *Green*, 897 F.3d at 180 (citing *Rodriguez*, 575

U.S. at 357). But Waznak had reasonable suspicion. He articulated a "'particularized and

objective' basis for suspecting that [Defendant] was engaged in criminal activity" before he

called for the dog, "so extending the traffic stop to facilitate a dog sniff was permissible." *Id.*

The forty-minute delay before the arrival of the Canine Unit does not alter the

outcome. Courts have found no issue with delays of this length, as long as "[o]fficers [were]

reasonably diligent" in furthering their investigation. *Hurtt*, 31 F.4th at 160 (quoting *Yusuf*,

993 F.3d at 182). *United States v. Leal*, 235 F. App'x 937, 942 (3d Cir. 2007), is instructive

in the circumstances presented here. In *Leal*, a police officer lawfully stopped the

defendant's car at approximately 1:30 p.m. *Id.* at 938; *United States v. Leal*, 385 F.Supp.2d

540, 542 (W.D. Pa. 2005). The officer suspected the vehicle contained narcotics and

requested a canine unit to respond to the scene at approximately 1:45 p.m. 385 F. Supp.

2d at 544. The canine unit arrived at the scene approximately forty-five minutes to an hour

later, resulting in a detention of one hour and twenty minutes. 235 F. App'x at 940; 385 F.

Supp. 2d at 545. The delay was attributed in part to road construction on route. Concluding

that "Leal's detention may have bumped up against the outer limit of a Terry stop, but it did

36

not cross it," the Third Circuit panel affirmed the district court's denial of the defendant's

motion to suppress. 235 F. App'x at 942. In doing so, the panel reasoned that the officer's

efforts to "expeditiously resolve his suspicions were frustrated by circumstances beyond his

control," and the "quantity and quality of the factors that gave rise to [the officer's] suspicion"

in conjunction with his diligent efforts to investigate demonstrated the reasonableness of the

*Terry* stop. *Id.*

   As in *Leal*, the delay here was reasonable. It is unfortunate that Defendant had to

wait forty minutes in the rain for the Canine Unit to arrive, and another ten for the canine to

be deployed. But he has offered no evidence that the delay was due to a lack of diligence,

or a diversion from the original mission, on Waznak's part. It was due to the remote location

of the Johnson property, a circumstance outside of the Troopers' control. *See id.*; *see also*

*United States v. Frost*, 999 F.2d 737, 742 (3d Cir. 1993) (holding eighty-minute delay was

reasonable, where delay was due in part to travel time). Thus, under *Rodriguez*,

Defendant's argument fails with respect to the extension of the stop.

   For many of the same reasons, the Court also finds the delay reasonable when

considered outside the context of traffic stops. The "reasonableness requirement of the

Fourth Amendment" governs seizures on "suspicion short of probable cause," and the

scope of a *Terry* stop "must be carefully tailored to its underlying justification." *Florida v.*

*Royer*, 460 U.S. 491, 500 (1983). Such "detention must be temporary and last no longer

than is necessary to effectuate the purpose of the stop." *Id.* at 500. Furthermore, the stop

must be "'minimally intrusive' and tailored by police to 'diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]'" *Foster*, 891 F.3d at 106 (quoting *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985) (citation omitted)).

As set forth *supra*, for the entire duration of the stop, the Troopers were acting diligently to investigate their suspicions, and those suspicions were confirmed with each piece of information they learned.  Throughout the encounter, the Troopers' questions were "tailored to [their] underlying justification." *Royer*, 460 U.S. at 500; *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("[T]he officer may ask the detainee a moderate number of questions to determine [the detainee's] identity and to try to obtain information confirming or dispelling the officer's suspicions.").  For example, they asked Defendant why he fled, they asked for identification, and they inquired about the purpose of the group's visit to the Johnson Property.  The answers they were given justified expanding the scope of the encounter incrementally, until Waznak eventually asked Delmoral whether there was any contraband in the Chrysler.  The Troopers maintained reasonable suspicion of criminal activity throughout the encounter, up until they called for a Canine Unit.  Any delay that resulted thereafter was not for lack of diligence; it was a foreseeable consequence of the rural location of the Property.  Therefore, the extension of the investigative stop was lawful.

### 5. Search of Vehicle

Defendant also challenges the search of the Chrysler.  Defendant contends the "dog's alert during the sniff-search of the Chrysler sedan did not provide a sufficiently

reliable and objective basis to establish probable cause to search the car." (Doc. 140 at 46.)

Warrantless searches are generally presumed to be unreasonable, subject to "a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One of such exceptions allows an officer to search the interior of a vehicle without a warrant provided he has developed "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299–300 (3d Cir. 2014). It is well established that "a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant." *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010); *see also United States v. Johnson*, 742 F. App'x 616, 622 (3d Cir. 2018).

To determine whether a drug detection canine is sufficiently reliable, the Supreme Court has provided the following guidance:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Florida v. Harris*, 568 U.S. 237, 246–47 (2013).

39

"A defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witness." *Id.* at 247.  If the defendant challenges the dog's reliability or the reliability of a particular alert, "then the court should weigh the competing evidence." *Id.* at 248. When weighing the evidence, "[t]he question—similar to every inquiry into probable cause— is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.*

Here, Rogowski testified that Khan was certified by the PSP in the detection of the odor of marijuana, hashish, cocaine hydrochloride, cocaine base, heroin hydrochloride and D/l methamphetamine hydrochloride.  (N.T. at 145.)  Khan was re-certified annually, and his most recent certification as of the date in question was in October 2019; he was certified again in October 2020.  (*Id.* at 144–46; Gov't Exs. 15, 16.)  Rogowski testified that Khan was deployed "thousands" of times over the course of six years.  (N.T. at 147.)

On this particular occasion, Rogowski observed Khan alert to the car twice—once at the "rear passenger side bumper back end" and again at the front "passenger side door." (*Id.* at 154–55.)  When asked if there was "any doubt in [his] mind that the dog had alerted," Rogowski answered, "No."  (*Id.* at 154.)

Defendant raises three arguments with respect to the alerts.  First, he attacks the certification itself as biased and insufficient because Khan was certified by PSP rather than

by an "external certification body or agency." (Doc. 140 at 48.)  Next, he emphasizes that Rogowski admitted that "there were instances when Khan had alerted to an odor, but no drugs were found." (*Id.*)  These arguments are set forth summarily and are without merit.

Finally, and most forcefully, Defendant argues that "Khan never objectively alerted to the presence of drugs" and that the search was "based solely on Trooper Rogowski's subjective interpretation of what he believed the canine's actions meant." (*Id.*)  Defendant cites a District of Utah case for the proposition that "[b]ehavior by the dog that is so subjective that only the handler may be able to identify it risks allowing a search in violation of the Fourth Amendment that is based on nothing more certain that the officer's hunch that drugs may be present." (Doc. 140 at 47 (quoting *United States v. Jordan*, 455 F. Supp. 3d 1247, 1254–55 (D. Utah 2020).)  Defendant contends the "video footage does not provide a basis for a third-party observer to objectively conclude that Khan had detected a target odor." (*Id.* at 49.)

This argument also fails.  Khan was certified by a "bona fide organization . . . after testing his reliability in a controlled setting," and Defendant offers no persuasive evidence to rebut the resulting presumption: "that the dog's alert provides probable cause to search." *Harris*, 568 U.S. at 246–47.  Watching the MVR of the first pass around the Chrysler at the Hearing, Rogowski testified, "I mean, right there, to me, that's clearly an alert, a change in body posture, he puts on the brakes, spun around, head snapped. Kind of hard to see here." (N.T. at 150.)  He goes on,

41

**Q.** You can see the dog, kind of, reversed direction?

**A.** He kind of puts on the brakes, his head goes up. Doing this for six years with this dog, you could see that head, that excitement, he's trying to zero it in.

**Q.** Is that, in fact, an alert?

**A.** That's an alert, yes. Closed mouth breathing, he's really trying to concentrate that odor into his nose.

(*Id.* at 153.)  Khan's alert during his first pass around the Chrysler is subtle but discernable on the MVR.  (*See* MVR at 1:07:27–30.)  Moreover, it is appropriate to consider Rogowski's interpretation of the dog's behavior in light of the fact that he and Khan were certified as a team and had worked together for six years at this point.  *See Johnson*, 742 F. App'x 616 at 622 (considering officer's testimony in light of officer's years-long working relationship with dog and upholding district court's finding that dog alerted to vehicle).

Because Khan's alert provided probable cause to search the Chrysler, the resulting search did not violate Defendant's rights under the Fourth Amendment.[16]

### B. Fifth Amendment

Lastly, while Defendant raises his Fifth Amendment argument only in passing (Doc. 140 at 21 n.3), the Court finds it has merit.  Defendant contends "the Troopers handcuffed, detained, and questioned Brown without providing Miranda warnings."  (Doc. 140 at 21.)

---

[16] Again, Defendant lacks standing to challenge the search because (1) he has no expectation of privacy in the vehicle, and (2) the search did not result from his seizure, nor was his seizure unlawful.  The Court addresses this argument only out of an abundance of caution.

The Fifth Amendment to the United States Constitution provides, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'"  *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461 (1996)).  In an effort to ensure these rights are protected, the United States Supreme Court has held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444. Commonly known as "*Miranda* rights" or "*Miranda* warnings," a defendant in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

"[P]olice officers are not required to administer Miranda warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Police are only required to provide warnings when a person is subjected to custodial interrogation, or "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  "Because the presence of both a custodial setting and official interrogation is required

to trigger the Miranda right-to-counsel prophylactic, absent one or the other, Miranda is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original); *United States v. Willaman*, 537 F.3d 354, 359 (3d Cir. 2006) ("Miranda, of course, requires warnings only when the person the police are questioning is in custody.").

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted). The focus of the inquiry is "upon the perceptions of the suspect, rather than the intent of the police." *Id.*; *see also Stansbury v. California*, 511 U.S. 318, 323 (1994) (explaining that the custody inquiry "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

The Government's argument seems to be rooted in the "custody" prong. Reciting the well-accepted principle that "a *Terry* investigative stop does not require *Miranda* warnings," (Doc. 139 at 47 (citing *Shatzer v. Maryland*, 130 S. Ct. 1213, 1224 (2010))), and citing cases wherein "roadside interrogation during a traffic stop" was held not to be custodial, (*id.* (citing, *e.g., United States v. Ley*, 876 F.3d 103, 108–09 (3d Cir. 2017)), the Government concludes that Defendant's Fifth Amendment challenge has no merit.

A person is in custody for purposes of *Miranda* when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "It is also established beyond doubt that a custodial interrogation may occur outside the police station." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citing *Orozco v. Texas*, 394 U.S. 324 (1969)); see *also Howes v. Fields*, 565 U.S. 499, 508-09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). "Where, as here, the individual has not been openly arrested when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" *Id.* (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)); *see also Willaman*, 437 F.3d at 359.

Courts must consider whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Third Circuit has identified five factors for a court to consider when determining whether a person is in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359–60; *see also United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010).

Here, Defendant was handcuffed upon being apprehended in the woods and remained handcuffed for the entirety of the encounter, lasting over ninety minutes.[17]  Police are within their bounds to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo" during a *Terry* stop, *United States v. Hensley*, 469 U.S. 221, 235 (1985), and handcuffs can serve to "neutralize the threat of physical harm."  *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010).   However, such physical restraint may at the same time render a suspect "in custody."

While the Troopers' testimony is equivocal with respect to whether he was initially questioned before or after he was handcuffed,[18] the Court finds it more likely that the Troopers prioritized handcuffing him upon apprehending him, for purposes of safety, and then proceeded to ask him why he ran, once the situation was under control.  Even if he was not yet handcuffed yet, he was heeding the Troopers' demands to stop running and was clearly not "free to leave."  Further, courts have held that suspects were in custody while merely "in the process of [being handcuffed]."  *See, e.g., United States v. Woodley*,

---

[17] The parties do not specify exactly when Defendant was arrested and transported from the scene.

[18] (*See* N.T. at 58, 68 (McGrath testified that "upon making contact with the individual, he was placed into handcuffs, asked who he was, and why he ran," but also testified, "I don't recall if he was immediately placed into handcuffs or was placed into handcuffs after having the interaction in which he informed us that he discarded drugs and was on parole.").)

No. CR 2020-0004, 2021 WL 1082225, at *8 (D.V.I. Mar. 20, 2021) (holding defendant's

Fifth Amendment rights were violated when he was asked whether he had a firearm license

while in the process of being handcuffed during a traffic stop).  The first, fourth, and fifth

*Willaman* factors therefore weigh heavily in favor of custody, and are sufficient to render him

"in custody" for practical purposes from the very beginning of the encounter.

While in custody, Defendant was interrogated, and therefore should have been read

his *Miranda* rights.  The Troopers asked him numerous times why he ran, which the police

should have known was "reasonably likely to elicit an incriminating response."  *Innis*, 446

U.S. at 301.  And in fact, Defendant responded several times over the course of the

encounter that he ran because he had marijuana on him, which is unquestionably

incriminating.  Therefore, Defendant's statements in response to the Trooper's questions

regarding why he ran from the Chrysler—*i.e.,* responses regarding his marijuana

possession and criminal record—are inadmissible at trial.

However, because "the fruit of the poisonous tree doctrine does not apply to

derivative evidence secured as a result of a voluntary statement obtained before Miranda

warnings are issued," this determination has no effect on the admissibility of the contraband

recovered from the Chrysler.  *United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001).

Defendant does not argue that his statements were involuntary, nor does the Court observe

any evidence suggesting as much on the MVR.  Accordingly, while his statements will be

suppressed at trial, any alleged fruits of those statements are unaffected and will not be

suppressed.  The statements may also be used to establish reasonable suspicion, so the

Fourth Amendment analysis set forth *supra* is also unaffected by this determination.  *See*

*United States v. DeSumma*, 44 F. Supp. 2d 700, 707 (E.D. Pa. 1999), *aff'd*, 272 F.3d 176

(3d Cir. 2001) (holding that statements obtained in violation of *Miranda* may be used to

establish probable cause).

## IV. CONCLUSION

For the foregoing reasons, Defendant Tylee Brown's Motion to Suppress Evidence

(Doc. 113) will be granted in part, with respect to his Fifth Amendment challenge, and

denied in part, with respect to his Fourth Amendment challenge.  A separate Order follows.

Robert D. Mariani
United States District Judge